*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MOORE, Minors.

UNPUBLISHED
November 13, 2024
9:37 AM

No. 369627
Ingham Circuit Court
Family Division
LC Nos. 23-001096-NA;
   23-001097-NA;
   23-001098-NA

Before: GADOLA, C.J., and SWARTZLE and LETICA, JJ.

PER CURIAM.

Respondent-father appeals as of right the trial court's order authorizing a petition to remove three of his children, EM, CM, and GM, from his care. Respondent-father contends that the trial court clearly erred by finding grounds for removal. We affirm.

## I. FACTS

On December 20, 2023, the Department of Health and Human Services (DHHS) filed a petition to remove the children pursuant to MCL 712A.2(b)(1)[1] and (2).[2] Respondent-father and

---

[1] The court may take jurisdiction over a child under 18 years of age if the child's parent, "when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals," or "who is subject to substantial risk of harm to his or her mental well-being," or "abandoned . . . ." MCL 712A.2(b)(1).

[2] The court may also take jurisdiction over a child under 18 years of age if the parent's "home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity . . . is an unfit place for the [child] to live in." MCL 712A.2(b)(2).

-1-

the children's mother were involved in ongoing custody proceedings in a separate family-court case regarding the children.

The petition filed in this child protective proceeding alleged that respondent-father had a history of child-protective proceedings involving these children, two of their half-siblings, and another one of respondent-father's children.[3] In particular, there were prior substantiated allegations of domestic violence, threatened harm, and improper supervision from 2012, 2014, 2018, and 2022.[4] EM and CM were removed from respondent-father's care in 2012 before being returned.

On July 28, 2023, Children's Protective Services (CPS) received a complaint involving allegations of physical abuse by respondent-father against EM. The report involved an event that occurred on June 24, 2023, when the children were visiting respondent-father, who had unsupervised parenting time for Father's Day.[5] At a subsequent interview, EM and CM reported to CPS that respondent-father became upset after they gifted him a shirt, which his current spouse purportedly disliked. Respondent-father slapped CM's face, inflicting a red mark, and called her a b****. Respondent-father also grabbed EM by the shirt. Thereafter, EM, who was afraid, ran to a gas station to contact his mother.

A subsequent CPS effort to engage respondent-father proved unfruitful. Respondent-father told CPS that he would not be cooperating and that if it "chose to report his home," it "should accompany themselves with an army . . . ."

The petition further alleged that the police sought criminal charges of first-degree child abuse and domestic assault against respondent-father on August 29, 2023. That same day, the children's mother filed an ex parte motion to suspend respondent-father's parenting time in respondent-father's and mother's custody case. The following day, in the custody case, the family court entered an order suspending respondent-father's parenting time and implementing parenting time supervised by respondent-father's mother at either respondent-father's home or at paternal grandmother's home across the street from respondent-father's home.

According to the petition in this child-protective proceeding, respondent-father continued to refuse to participate in services or case planning until he appeared for a family-team meeting on December 19, 2023. During the meeting, respondent-father's conduct escalated, stating that he would not participate in CPS services and that CPS was "not to contact him nor show up at his residence."

---

[3] Respondent-father has ten children.

[4] The 2022 incident involved an allegation that respondent-father threw a motocross racing boot at one of the children's half-siblings in July, physically injuring him. The petition filed regarding the 2022 matter was dismissed after the child recanted and respondent-father refused to allow that child to be forensically interviewed. As to that incident, respondent-father was issued "[a] zero-tolerance letter" because he threatened a CPS specialist.

[5] Father's Day was the prior Sunday.

The next day, the children's mother reported several statements that respondent-father had made to the children during his supervised parenting time on December 19, 2023. Respondent-father told the children that he would be going to jail for 25 years and that he blamed "DHHS and the courts." Further, respondent-father was "trying to make the children believe what was done is okay and he will go to jail for nothing."

As already mentioned, the petition to remove the subject children from respondent-father's care was filed on December 20, 2023. It stated that "[o]ngoing concerns remain for the safety of [respondent-father's] children in his care due to his history and pattern of physical abuse coupled with his lack of cooperation in services to attempt to rectify the safety issues for his children."

At the preliminary hearing held on the 20th, the CPS investigator testified about allegations contained in the petition. Her main concern was respondent-father's history and pattern of physical abuse. Although reasonable efforts had been made to prevent removal in the present and prior cases, custody with respondent-father presented a substantial risk of harm to the children's lives, physical health, or mental well-being. The investigator further testified that she was aware that there was a hearing scheduled in the custody matter in the future; however, she did not believe that supervised parenting time was sufficient to safeguard the children from potential harm because respondent-father had refused to participate in any services, had "made it clear that he is not willing to cooperate with CPS at this time," and had a history of physical abuse. DHHS asked the referee to maintain the children's current placement with their mother and that supervised visitation for respondent-father remain in its discretion.

Respondent-father's counsel urged the referee to deny the petition. Counsel argued that conditions had not changed since the time of the incident "six months ago" and the filing of the petition. Indeed, the ongoing custody proceedings, including the "safeguards in place," were sufficient.

On the other hand, the children's lawyer-guardian ad litem (L-GAL) noted the pending request for criminal charges and explained that the hearing in the custody matter was not scheduled until January 26, 2024. And, despite the supervised parenting order in effect, the children were "still being exposed to conduct that would be a risk of harm, [even] if it's psychological harm to the children."

The referee found probable cause to believe that respondent-father struck CM and that EM ran away in fear. The referee expressed concern over respondent-father's history and pattern of behavior. The referee found that respondent-father needed services, but refused to engage in them. Moreover, the referee determined that remaining in the home with respondent-father was contrary to the children's welfare. The referee recommended authorizing the petition, leaving the children placed with their mother, and allowing supervised parenting time for respondent-father in DHHS's discretion. The trial court signed the referee's recommended order the same day.

On December 22, 2023, respondent-father objected to the referee's recommendation, arguing that sufficient safeguards were in place after the ex parte order establishing supervised

parenting time in the custody matter was entered.[6]  A week later, respondent-father moved for rehearing or reconsideration.  In part, respondent-father

> adamantly denie[d] smacking his daughter[;] however, even if he had smacked his daughter, he ha[d] a right to reasonably discipline his child.  What actually happened was that [respondent-father] scolded his daughter for being disrespectful. Him scolding her caused her to cry.  After he scolded her, he talked to her and told her why he had scolded her[;] she indicated that she understood her actions were not acceptable.  That was the end of the situation.[7]

Respondent-father also alleged that he had "discovered that [mother] wanted to relocate the children to Florida" and that he "believe[d] that this [was] all part of [mother's] plan" to do so without his interference.  Regarding the delay in reporting the June incident, respondent-father noted that CPS contacted him on November 12, 2023, inquiring about a separate investigation involving EM, which did not involve allegations against respondent-father.  When respondent-father contacted CPS the next day, the worker informed him about an investigation involving mother.  The worker also purportedly told respondent-father about the instant complaint, indicating that it "had been sitting on her desk for months" and that the only reason that it had not been closed was the pending request for a first-degree child abuse charge.[8]  In light of this information, respondent-father asked the court to set aside the order following the preliminary hearing or, in the alternative, to enter an order that the children were not removed from his care.[9]

On January 11, 2024, the trial court issued an order denying respondent-father's motion for reconsideration because: (1) "[t]he facts of the case easily reach the low standard of preponderance of evidence," (2) it was "clear" from the allegations that respondent-father "refuses to cooperate with CPS and law enforcement," and (3) respondent-father failed to present a matter not previously considered.  To the contrary, the court was fully aware of its earlier order in the custody case.  Finally, the court explained that "[t]he petition set[] forth additional history regarding [respondent-father's] pattern of physical abuse, domestic violence[,] and assaultive behavior, which was concerning."

---

[6] Respondent-father did not further pursue this objection.

[7] Respondent-father explained that his wife was present when this incident happened and further alleged that, despite being apprised of this, "CPS advised that they were not interested in hearing from her."

[8] Respondent-father alleged that when his attorney looked into whether there were pending charges, "there were no such charges pending."  This information was conveyed to the CPS worker.

[9] Respondent-father alleged that as to the children remaining in his home, the parties' and respondent-father's wife entered into a safety plan not to leave the couple's minor children in respondent-father's care unattended.

The trial court then held the pretrial.[10]  Respondent-father again asked the court to reinstate the supervised parenting time arrangement that was in place before the petition was filed.  CPS reported that respondent-father had been referred to an agency for supervised parenting time.  It was further reported that respondent-father had been having telephone and text communication with the children.  The L-GAL opined that these communications were not permitted without a supervisor being present.  Finally, the L-GAL relayed that all three children were "scared" of respondent-father and that "all three reported that they would like a time-out" or separation from him.

The trial court denied respondent-father's request to reinstate supervised parenting time; instead, it ordered that parenting time would be suspended until the agency referral for supervised parenting time took effect.[11]  The trial court expressed concern that respondent-father could have a "tendency to try to influence the children," noting the upcoming trial, and it repeated that there would be no contact until the agency decided "what kind of supervised visitation is appropriate."

During the pretrial, respondent-father continued to maintain that "nothin' happened" and "I did nothing wrong."  Respondent-father also denied that his children were afraid of him.  To the contrary, he claimed that they sent him text and social-media messages reflecting that they missed and loved him.  Respondent-father further claimed that mother allowed the children to spend time with him at Christmas.

Respondent-father subsequently appealed the removal order.

## II.  ANALYSIS

"We review the interpretation and application of statutes and court rules de novo."  *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019).  The trial court's application of its findings of fact to a statute presents a question of law that we review de novo.  *Id*.  In turn, we review a trial court's findings of fact for clear error.  *In re Benavides*, 334 Mich App 162, 167; 964 NW2d 108 (2020).  "A finding is clearly erroneous if, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made."  *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009) (quotation marks and citation omitted).  We further defer "to the trial court's special opportunity to judge the credibility of the witnesses."  *Id*.  And any error in the trial court's removal order is not grounds for reversal unless it would be inconsistent with substantial justice to permit it to stand.  See *In re Williams*, 333 Mich App 172, 185; 958 NW2d 629 (2020); MCR 2.613(A).

"At the preliminary hearing, the court must decide whether to authorize the filing of the petition and, if authorized, whether the child should remain in the home, be returned home, or be placed in foster care pending trial."  *In re Benavides*, 334 Mich App at 167 (quotation marks and

---

[10]  The parties represented that they were prepared to argue respondent-father's motion for reconsideration or rehearing before they received the court's order denying it.

[11]  It was further mentioned that there was a personal protection order entered for mother and the children on August 1, 2023.

citations omitted). The court may authorize the filing of the petition upon a showing of probable cause that one or more of the allegations contained in the petition are true and fall within MCL 712A.2(b). See MCL 712A.13a(2) and MCR 3.965(B)(12). Probable cause exists "when there is a reasonable ground of suspicion supported by circumstances sufficiently strong to warrant a cautious person to believe" that the allegations made are true. See e.g., *People v Carter*, 250 Mich App 510, 521; 655 NW2d 236 (2002).

MCR 3.965(C)(2) address pretrial placement. It provides:

The court may order placement of the child into foster care if the court finds all of the following:

(a) Custody of the child with the parent presents a substantial risk of harm to the child's life, physical health, or mental well-being.

(b) No provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from the risk as described in subrule (a).

(c) Continuing the child's residence in the home is contrary to the child's welfare.

(d) Consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child.

(e) Conditions of child custody away from the parent are adequate to safeguard the child's health and welfare.

See also MCL 712A.13a(9).

To order removal of the minor child, the trial court "must make explicit findings that it is contrary to the welfare of the child to remain at home, MCR 3.965(C)(3), and reasonable efforts to prevent the removal of the child have been made or that reasonable efforts to prevent removal are not required, MCR 3.965(C)(4)." *In re Benavides*, 334 Mich App at 168 (quotation marks omitted). "A trial court is generally not obligated to articulate extensive findings regarding every conceivable detail. However, when a statute or court rule requires factual findings as to an enumerated list of factors, the trial court must make a record of its findings as to each and every factor sufficient for this Court to conduct a meaningful review." *Id*. (citations omitted). The preponderance of the evidence standard applies. *In re Williams*, 333 Mich App at 183.

Respondent-father argues that a substantial risk of harm to the children was not established and that the trial court clearly erred by failing to explain why removal was necessary when his parenting time was already restricted to supervised visitation and there was no indication that its conditions were violated. In this case, however, both the referee and the court were aware of the supervised visitation order in the custody matter. And, between the initial incident and the authorization of the petition, respondent-father repeatedly informed CPS that he would not cooperate with its investigation. And, during the one meeting respondent-father actually attended, his conduct escalated, he stated that he would not participate in CPS services, and he said that CPS

was "not to contact him nor show up at his residence." The next day, the children's mother reported that, during respondent-father's supervised visitation, he told the children that he would be going to jail for 25 years and that he blamed "DHHS and the courts." Respondent-father attempted "to make the children believe" that his behavior was acceptable and that "he will go to jail for nothing." Given respondent-father's actions and remarks in light of the pending criminal charges and his lengthy history of prior substantiated allegations of domestic violence, threatened harm, and improper supervision, the trial court did not clearly err in determining that custody of the children with respondent-father presented a substantial risk of harm to their physical health or mental well-being. MCR 3.965(C)(2)(a). During the preliminary hearing, the children's L-GAL argued that they were "still being exposed to conduct that would be a risk of . . . psychological harm to" them. The court also later expressed concern that respondent-father would "try to influence the children" in advance of the adjudication trial. Likewise, the court did not clearly err in determining that removal was its only option to adequately safeguard the children from the risk posed by respondent-father. MCR 3.965(C)(2)(b). Further, the court did not clearly err in determining that continuing the children's residence in respondent-father's home under supervised visitation was contrary to their welfare. MCR 3.965(C)(2)(c). Finally, the court did not clearly err in finding that reasonable efforts were made to prevent or eliminate the need to remove the children, MCR 3.965(C)(2)(d), and that the conditions of custody away from respondent-father and with mother were adequate to protect the children's health and welfare, MCR 3.965(C)(2)(e). Indeed, the children later informed CPS that they were "scared" of respondent-father and wanted "a time-out" or separation from him. In sum, there was ample evidence from which the trial court could find by a preponderance of the evidence that authorizing the petition and removing the children was proper.[12]

Affirmed.

/s/ Michael F. Gadola
/s/ Brock A. Swartzle
/s/ Anica Letica

---

[12] We reject petitioner's alternative arguments that respondent's appeal is moot or harmless given respondent-father's subsequent plea on the fourth day of the adjudication trial. In support of this argument, petitioner points to the circuit court's updated register of actions, reflecting that respondent-father admitted to the allegations in petition insofar as they described his families' composition and an added paragraph, reading: "THE CHILDREN HAVE SEEN DV [DOMESTIC VIOLENCE] IN THE HOME AND HE AND HIS CHILDREN WOULD BENEFIT FROM SERVICES." Presumably, petitioner asks us to take judicial notice of this information contained in the updated register of actions provided as an attachment to its brief. See MRE 201. If we did so, we recognize that respondent-father, on request, would be entitled to be heard on our decision. MRE 201(e). In any event, "[g]enerally speaking, a case becomes moot when an event occurs that makes it impossible for a reviewing court to grant relief." *In re Detmer*, 321 Mich App 49, 56; 910 NW2d 318 (2017). Because the issues of jurisdiction and removal of the children from a parent's custody are distinct, it would not be impossible for this Court to provide relief from the removal order at issue, notwithstanding respondent-father's subsequent plea to the court exercising its jurisdiction over the children.